## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | NO.: 1:23-cv-01311-WMR |
| v. | : | |
| | : | |
| TOTAL SYSTEM SERVICES, LLC, | : | |
| | : | |
| Defendant. | : | |

## ORDER

This matter is before the Court on Magistrate Judge's Final Report and Recommendation ("R & R") [Doc. 50], which recommends that Defendant's Motion for Summary Judgment [Doc. 36] be GRANTED IN PART and DENIED IN PART and that Plaintiff's Motion for Partial Summary Judgment [Doc. 31] be DENIED. Both parties have filed objections to the R & R. For the reasons that follow, the Court overrules the parties' respective objections and adopts the findings and conclusions in the R & R as the Order of the Court.

## OVERVIEW OF THE CASE

The Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") brings this action against Total System Services, LLC ("Defendant") based on allegations that Defendant failed to reasonably accommodate its former employee

1

Joyce Poulson's ("Poulson") disabilities, retaliated against her for taking FMLA leave by excluding her from her requested accommodation, and constructively discharged her in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101, *et seq*. [*See* Doc. 3].

Defendant has moved for summary judgment as to all of Plaintiff's claims, whereas Plaintiff has moved for partial summary judgment on the issue of whether Poulson qualifies as "disabled" for the purposes of the ADA. In making his recommendation to this Court, the Magistrate Judge concluded that genuine issues of material fact exist as to: (i) whether Poulson was disabled; (ii) whether Poulson required an accommodation and could have performed the essential functions of her job with an accommodation; and (iii) whether Defendant denied Poulson a reasonable accommodation. However, the Magistrate Judge concluded that Plaintiff failed to establish a viable retaliation claim and, further, that there is insufficient evidence to support its claim that Poulson was constructively discharged from her employment.

## I.  LEGAL STANDARDS

<u>On a Report and Recommendation</u>

In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. §

636(b)(1). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) (citing *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988)) (internal quotation marks omitted). As for the other portions of the report and recommendation to which no specific objections are made, "the appropriate standard of review … is clear error." *Lattimore v. Bank of Am., N.A.*, No. 12-CV-1776, 2014 WL 11456272, at *1 (N.D. Ga. Feb. 10, 2014), *aff'd sub nom. Lattimore v. Bank of Am. Home Loans*, 591 F. App'x 693 (11th Cir. 2015). Because objections have been filed in this case by both parties, the Court shall conduct a *de novo* review of the specific matters raised by the objections and review the remainder of the report and recommendation for clear error.

On Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure lets courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if evidence suggests a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a genuine dispute is found, summary judgment must be denied, and "court[s] may not weigh evidence to resolve factual disputes." *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993).

The movant bears the burden of showing there is no genuine issue of material fact to be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Furthermore, courts must consider evidence and any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159 (1970). If the moving party carries its initial burden, then the burden shifts to the nonmovant to demonstrate an issue of material fact, and summary judgment is only appropriate if the nonmovant fails to meet its burden of presenting evidence sufficient to create a genuine issue of material fact as to an essential element of its claim. *Celotex Corp.*, 477 U.S. at 323.

## II. FACTS

The underlying facts of the case can be summarized as follows. Poulson worked for Defendant as a Customer Service Representative ("CSR") from October 2016 until her employment ended on August 7, 2020. [Doc. 36-2 at ¶7; Doc. 32 at 12–13]. Each CSR handled calls for specific credit card issuer clients, and each of those accounts generally required specific training. [Doc. 40 at 34–35; Doc. 36-3 at ¶14]. During the relevant time period, Poulson was assigned and trained to handle customer service calls for three clients: Navy Federal Credit Union; Regions Bank; and SunTrust Bank. [Doc. 32 at 28]. Although the majority of Poulson's work required her to handle calls regarding travel-related benefits, she was

"uncomfortable" handling those types of calls and relied on coworkers to help her resolve the customers' issues and questions. [*Id.* at 28–32; *see also* Doc. 32-14].

Prior to the COVID-19 Pandemic, Defendant had not allowed any CSR's to work remotely due, in part, to the contractual obligations imposed by some of its card issuer clients. [Doc. 36-2 at ¶59; Doc. 36-3 at ¶20]. However, after the outbreak of the COVID-19 Pandemic, several of Defendant's credit card issuer clients amended their contracts with Defendant to permit its employees to work remotely on their accounts. [Doc. 36-3 at ¶31]. Accordingly, Defendant began moving as many employees as possible to a remote working environment, provided they had the capability and equipment to do so. [Doc. 36-2 at ¶¶67–68].  According to Defendant, Poulson was not initially selected for a remote work position because she was not considered to be self-sufficient in handling her calls and one of her assigned clients, SunTrust Bank, still would not permit remote work. [*Id.* at ¶136; *see also* Doc. 36-3 at ¶39]. For those employees who were unable to move into remote work positions, Defendant implemented protocols and procedures on the premises to ensure their health and safety. [Doc. 36-2 at ¶¶70, 75].

As of 2020, Poulson suffered from hypertension and was classified by her doctor as being "pre-diabetic." [Doc. 36-2 at ¶101; Doc. 32 at 97–98].  However, Poulson testified at her deposition that her "pre-diabetes" condition did not limit her

day-to-day activities or affect her ability to do her job and that her hypertension was being adequately controlled by medication. [Doc. 32 at 98–99].

On May 14, 2020, Poulson and other employees were informed that one of their coworkers had tested positive for COVID-19. [Doc. 36-2 at ¶146; Doc. 32 at 63–64; Doc. 32-36]. Due to her potential exposure to COVID-19, Poulson was advised by her primary care physician, Dr. Carlyn Sainvil, to self-quarantine for a period of fourteen days. [Doc. 36-2 at ¶¶155, 161; Doc. 32 at 75–76; Doc. 33-1]. While out on this initial self-quarantine period, Poulson applied for Family and Medical Leave Act ("FMLA") and short-term disability ("STD") leave through the third-party administrator for Defendant's leave and benefits programs. [Doc. 36-2 at ¶¶162–163 ; Doc. 32 at 77–78]. Poulson sought such leave because she was suffering from severe anxiety and other health issues due to her fear of being exposed to COVID-19 upon her eventual return to work. [Doc. 32 at 105–06; Doc. 33-4 at 5; Doc. 33-5]. Poulson informed her supervisor, Crystal Wright, of her application for such leave on May 20, 2020. [*Id.*]

On May 24, 2020, Poulson emailed Wright to inform her that, due to the instance of COVID-19 at the office, she (Poulson) did not feel comfortable returning to work until her doctor advised otherwise, further stating that "[i]f I could work from home that would be ideal, which in my opinion should have been offered to me weeks ago." [Doc. 32-38 at 2]. In her reply to the email, Wright did not specifically

respond to Poulson's request to work from home, simply stating "I will continue to use your available leave to pay you during this time, unless [the third-party administrator] approves your [FMLA] leave request." [*Id.* at 1].

On June 1, 2020, Poulson consulted with her primary care physician, Dr. Sainvil, and asked her to recommend extended leave from the office because of the risk of contracting COVID-19. [Doc. 36-2 ¶¶ 173–176; Doc. 32 at 90–92; Doc. 33-2 at 8–9]. Dr. Sainvil declined to recommend extended leave because she noted that Defendant had implemented social distancing and other COVID-19 protective measures. [*Id.*] Nevertheless, Dr. Sainvil did issue a letter recommending that Poulson be permitted to work from home due to her medical conditions that placed her at a high-risk of suffering severe effects if she were to contract COVID-19. [*Id.*; *see also* Doc. 33-3 at 3]. On June 3, 2020, Poulson transmitted this letter to Defendant's Human Resources personnel who, in turn, informed Wright of Poulson's physician-based request to work from home. [Doc. 36-2 at ¶186; Doc. 33-3 at 1; Doc. 39 at 107–110; Doc. 39-17]. In response, Wright indicated that Defendant would go through its standard process to ascertain if it was possible to assign Poulson to a work-from-home position. [Doc. 36-2 at ¶¶199–200; Doc. 39 at 110–11]. It does not appear that Wright engaged in any interactive process to assess Poulson's disability-related request. Meanwhile, Poulson had been approved for FMLA leave through July 9, 2020. [Doc. 36-2 at ¶ 206; Doc. 32 at 107].

On June 12, 2020, Wright emailed Poulson (while she was on FMLA leave) to inform her that she would be considered for the next round of work-from-home assignments and requested that Poulson perform an internet speed test at her home. [Doc. 36-2 at ¶¶ 212–214; Doc. 32 at 114–16]. After Poulson submitted the results, Wright explained that Poulson's internet "upload speed" was less than the 10Mb required by Defendant for a work-from-home position. [Doc. 32 at 117; *see also* Doc. 32-51]. In addition to the internet speed issue, Defendant's work-at-home process required employees to pick up the equipment and be trained on the systems while at the office and, thus, Poulson would not be eligible or qualified to work from home until she was released from FMLA leave. [Doc. 36-2 at ¶¶223–226; Doc. 32 at 95–96; Doc. 40 at 97–98; Doc. 42 at 21–24, 31–32, 44–45].

As of June 15, 2020, during the time Poulson remained on FMLA leave, the limited number of work-from-home positions were filled by CSRs who were on the "approved" list and no new slots were available to anyone in Poulson's office. [Doc. 36-2 at ¶¶228-229; Doc. 42 at 63–65; Doc. 41 at 117–118; Doc.41-20]. Poulson was released from FMLA leave and returned to work on July 9, 2020. [Doc. 32 at 126–27].  From the time Poulson returned to the office on July 9, 2020, through her eventual resignation on August 7, 2020, no additional work-from-home slots were assigned to CSRs. [Doc. 36-2 at ¶¶282–283; Doc. 32 at 125–26; Doc. 36-3 at ¶¶56–57].

On August 7, 2020, Poulson resigned from her employment, telling Human Resources personnel that "she [felt] as though she couldn't get ahead in the place" and that "she was just… going to quit and that she had found some other employment." [Doc. 36-2 at ¶¶ 335–337; Doc. 39 at 118–19]. The next day, Poulson sent an email to Wright stating:

> I am writing this note as requested to inform you of my decision to resign my employment from TSYS. My reasons for resigning are due to the many positive test results of corona virus affecting co-workers and employees, the blatant disregard for my health and well-being as recommended by my primary care physician that I work from home, and the stress of working in this environment that has caused me to now be on anxiety medication. All this has affected my job performance and I believe it was in my best interest to resign before I would potentially be terminated…. I can say this has been an unforgettable experience.

[Doc. 36-2 at ¶338; Doc. 32-60].

Four months later, Poulson began another job that involved in-person work at a medical care facility during the height of the COVID-19 pandemic, where she understood she would be working in the office 50% of the time. [Doc. 36-2 at ¶¶339– 340; Doc. 32 at 145–49, 211].  In connection with her new employment, Poulson filled out a Voluntary Self-Identification of Disability form indicating that she did not have any disability or any history of having a disability. However, Poulson testified at her deposition that she lied about her health conditions because she believed she would not get the job if she disclosed her disabilities. [Doc. 32 at 153– 54; Doc. 32-67].

## III. DISCUSSION

In its Amended Complaint, Plaintiff asserts three claims under the ADA. Specifically, Plaintiff alleges: (1) that Defendant unlawfully denied Poulson's requests for a reasonable accommodation for her disabilities [Doc. 3 at ¶¶60–65]; (2) that Defendant constructively discharged Poulson because of her disabilities and/or because she engaged in protected activity [*id.* at ¶¶66–71]; and (3) that Defendant retaliated against Poulson for engaging in a protected activity (taking FMLA leave) [*id.* at ¶¶72–81]. On the parties' cross-motions for summary judgment, the Magistrate Judge recommends that Defendant's motion be granted as to Plaintiff's constructive discharge and retaliation claims and denied as to Plaintiff's failure to accommodate claim, and that Plaintiff's motion for partial summary judgment on the issue of whether Poulson had a disability for purposes of the ADA be denied. Both parties have filed objections to the R & R, which the Court shall address in turn.

### A. Defendant's Objections to the R & R

### 1. The R&R's "Qualified Individual" Analysis

Defendant first objects to the Magistrate Judge's conclusion that there is a genuine issue of material fact as to whether Poulson was a "qualified individual"

under the ADA.[1] [*See* Doc. 55 at 3–5]. Specifically, Defendant argues that the Magistrate Judge misapplied the law and incorrectly held that the issue of whether Poulson was a "qualified individual" under the ADA did not require consideration of her actual requested accommodation (a work-from-home position). [*Id*.] But Defendant's argument mischaracterizes the Magistrate Judge's analysis.

In the R&R, the Magistrate Judge noted that there does not appear to be any dispute that Poulson was qualified to perform the essential functions of her CSR position *without* an accommodation. In this case, however, the central issue is whether Poulson's "disabilities" placed her at a higher risk of suffering severe COVID-19 effects such that a reasonable accommodation should be made. Thus, the question turns to whether Poulson could continue to perform the essential functions of her job *with* an accommodation.

In moving for summary judgment, Defendant argues that Poulson could not perform the essential functions of her job with her requested accommodation (remote work) because her internet speed at home was insufficient, she struggled with calls related to travel benefits and relied on assistance from coworkers to handle those types of calls, and one of the clients assigned to Poulson (SunTrust) did not permit remote work on their accounts. [*See* Doc. 36-1 at 5–7]. In his "qualified

---

[1] Under the ADA, a "qualified individual" is a person with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position." 42 USC § 12111(8).

individual" analysis, the Magistrate Judge merely pointed out that some of those arguments relate more to the issue of whether a work-from-home position was the appropriate accommodation for Poulson's disabilities, not whether Poulson was a qualified individual who required a reasonable accommodation for her disabilities. [*See* Doc. 50 at 30–31].  And, contrary to Defendant's argument in its objection, the Magistrate Judge did consider the requested accommodation (remote work) in his "qualified individual" analysis, concluding that there were genuine issues of material fact as to whether Poulson had the ability to perform her same job functions while working remotely and otherwise met Defendant's requirements for a work-from-home position. Accordingly, the Court overrules this objection.

**2.** Failure to Accommodate

In its remaining objection, consisting of several subparts, Defendant argues that the Magistrate erred in finding that a genuine issue of material fact exists as to Plaintiff's failure to accommodate claim.  Essentially, Defendant argues three main points: (1) that the evidence was undisputed that Poulson was not a "qualified individual" under the ADA; (2) that the requested accommodation (remote work) was not a reasonable request; and (3) that the requested accommodation would have imposed an undue burden on Defendant. The Court is not persuaded by any of the arguments.

### a. Qualified Individual Issue

Defendant argues that that it is undisputed that the requirements for CSRs to be eligible for a work-from-home position are: sufficient internet speed; the ability to work self-sufficiently; and trained to service enough clients who allow remote work to ensure that the CSR would have a sufficient workload. Defendant contends that these requirements constitute essential job functions for the purposes of the "qualified individual" analysis.

Although an employer's business judgment or opinion is entitled to substantial weight when determining what job functions are "essential" to a position, *see* 42 U.S.C. § 12111(8), this factor alone is not conclusive. Whether a particular job function is essential is "evaluated on a case-by-case basis by examining a number of factors" and, thus, the issue is "typically not suited for resolution on a motion for summary judgment." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200–01 (11th Cir. 2014); see also *Jernigan v. BellSouth Telecomms.*, LLC, 17 F.Supp.3d 1317, 1321–26 (N.D. Ga. 2024). Here, there are genuine issues of fact as to whether Defendant's criteria for remote work were indeed "essential" and, even if they were, whether Poulson met (or could have met) those requirements.

Defendant first contends that it is undisputed that Poulson could not meet the internet speed requirement, which is one of Defendant's stated requirements for a CSR work-from-home position. [Doc.55 at 9–11]. In support of its argument,

Defendant points to evidence that Wright informed Poulson that the results of her internet speed test indicated that she did not have the required 10Mb internet speed to work from home. However, the record reflects that Wright also informed Poulson that "maybe [her internet] could still be used" despite the slower upload speed. [*See* Doc. 32-51 at 1]. Poulson stated in her Declaration that she understood Wright's statement to mean that her internet speed was possibly sufficient to work from home. She further stated that she would have taken action to upgrade her internet service if she had been informed that her internet speed prevented her from obtaining her requested accommodation (a work-from-home CSR position). [Doc. 31-3 at ¶¶56–58]. Thus, there is a genuine issue of fact as to whether the 10MB internet speed was an essential requirement for remote work and whether Poulson could have met that requirement.

Defendant next contends that the evidence is undisputed that Poulson could not be "self-sufficient" if she worked remotely, which Defendant contends is another essential requirement for a work-from-home CSR position. [Doc.55 at 11–13]. Although Defendant cites to evidence that Poulson struggled with calls related to travel benefits, relied on assistance from coworkers to handle those types of calls, and generally "needed assistance…to perform at an appropriate level," [*see* Doc. 36-3 at ¶¶137–139], the record also shows that Poulson could readily access assistance, if needed, while working remotely. [Doc. 31-3 at ¶18–20]. Additionally, Poulson

stated that she was never told by her supervisor (Wright) or anyone else in management that she was not self-sufficient, nor had she ever been counseled for any lack of self-sufficiency. [*See* Doc. 31-3 at ¶12]. Further, there is evidence to show that Poulson had a record of good performance, awards, and recognition during her employment, including having been ranked in the top 10% of CSRs during Defendant's 2020 Merit Increase Process. [*See* Doc. 31-3 at ¶¶13–17; Doc. 49 at ¶¶10–14]. Thus, based on the evidence in the record, there is a genuine factual dispute regarding Poulson's "self-sufficiency" and ability to work remotely that must be decided by the trier of fact.

In its last objection regarding the "qualified individual" issue, Defendant contends that Poulson could not meet the final stated requirement for a work-from-home CSR position—a sufficient workload. [Doc. 55 at 13–15]. Specifically, Defendant contends that Poulson would not have a sufficient workload if she worked remotely because the evidence is undisputed that one of her three assigned credit card issuer clients, SunTrust, did not allow remote work on their customer accounts. [*Id.*] However, the Court notes that Poulson had also been trained to handle other credit card issuer clients, in addition to her three assigned clients. [Doc. 31-3 at ¶¶4, 9; Doc. 32 at 28; Doc. 40 at 80]. Thus, it appears that Defendant could have provided the accommodation by assigning her to handle calls for additional clients or adjusting her client assignments to ensure that she had a sufficient workload while

working remotely.  Furthermore, there is evidence to show that the call volume from credit card customers regarding travel-related benefits dramatically decreased for all CSRs in the Spring and Summer of 2020 because travel was severely restricted due to the COVID-19 pandemic. [Doc. 42 at 18; Doc. 36-2 at ¶115].  As other CSRs were transferred to remote work positions despite the decrease in call volume, the foregoing evidence calls into question whether a "sufficient workload" was indeed an essential requirement for a work-from-home CSR position during the COVID-19 pandemic and whether Poulson could have otherwise met that requirement.

For the above reasons, the Court finds that the Magistrate Judge correctly concluded that there are genuine issues of material fact as to whether Poulson was a "qualified individual" under the ADA.

### b. *Reasonableness of Requested Accommodation*

In moving for summary judgment, Defendant argues that Poulson's requested accommodation (a work-from home CSR position) was unreasonable because it required significant changes to her job duties and the reallocation of some of those duties to other employees. [Doc. 36-1 at 7–8]. In its objection to the R&R, Defendant argues that the Magistrate Judge erred in concluding that it failed to show an absence of disputed material facts regarding the reasonableness of the requested accommodation. [Doc. 55 at 15–19].  Having reviewed the findings and conclusions

in the R & R, the Court agrees with the Magistrate Judge's recommendation on this issue.

The ADA provides that an employer unlawfully discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations" for the employee, unless "the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010). A reasonable accommodation may include job restructuring, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of policies, and other similar accommodations. *See* 42 U.S.C. § 12111(9)(b). Determining what is reasonable for each individual employer is a highly fact specific inquiry that will vary depending on the circumstances and necessities of each employment situation. *See Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1527 (11th Cir. 1997). The regulations provide that an employer may restructure a job by reallocating or redistributing non-essential, marginal job functions, but an employer is not required to reallocate essential functions. The essential functions are those that the individual who holds the job would have to perform, with or without accommodation, in order to be considered qualified for the position. *See* 29 C.F.R. 1630.2(n); *Holbrook*, 112 F.3d at 1527; *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (an employer is not required to reallocate

job duties in order to change an essential function of the job). Nor is the employer required to eliminate essential functions of the job. *Holly v. Clairson Industries, LLC*, 492 F.3d 1247, 1256 (11th Cir. 2007); see also *Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994).

As noted earlier, it is undisputed that Poulson was qualified to perform the essential functions of her CSR position without an accommodation.  But, again, the issue in this case is whether Poulson's alleged disabilities placed her at a higher risk of suffering severe COVID-19 effects such that she should have been provided the accommodation of working from home to avoid that disability-related risk. Defendant argues that this accommodation was not reasonable because Poulson could not meet the essential requirements for a work-from-home CSR position—i.e., sufficient internet speed, the ability to work self-sufficiently, and a sufficient workload. Because this Court has concluded that there are genuine issues of material fact on these points, a genuine issue of material fact remains as to the reasonableness of Poulson's requested accommodation.

In so ruling, the Court has considered Defendant's argument that the Magistrate Judge erred in applying the holding in *Holly v. Clairston Industries, LLC*[2] to the facts of this case [Doc. 55 at 16–19] and it is unpersuaded by Defendant's arguments on this point.

---

[2]  492 F.3d 1247 (11th Cir. 2007).

In *Holly*, the plaintiff had a disability that often caused him to arrive late to work. *Holly*, 492 F.3d at 1249. The employer later implemented a "no fault" attendance policy, which automatically required termination after eighteen tardies during a one-year period. *Id*. at 1253. When Holly was terminated under that policy, he sued his former employer for failure to accommodate his disability. *Id*. at 1254–55. The employer argued Holly was not a "qualified individual" under the ADA because being excused from the "no fault" tardy policy would eliminate "strict punctuality," which it deemed to be an essential job function. *Id*. at 1256. The district court granted summary judgment to the employer on plaintiff's claims, concluding that strict punctuality, according to the employer's policy, was an essential function of plaintiff's position and that no reasonable accommodation would enable him to perform that function. On appeal, the Eleventh Circuit reversed the district court's judgment, holding that there was a genuine dispute of material fact as to whether punctuality, as defined by the employer's policy, was indeed an essential element of plaintiff's job. *Id*. at 1261. Further, the Eleventh Circuit held that the employer could not avoid liability under the ADA simply by "treating its non-disabled employees exactly the same as its disabled employees" under its attendance policy. *Id*. at 1262. In so holding, the Eleventh Circuit acknowledged that some preferential treatment may be necessary to enable a disabled employee "to obtain the same workplace opportunities that those without disabilities…enjoy." *Id*. at 1263.

In the present case, much like the employer in *Holly*, Defendant denied Poulson's request for an accommodation based on criteria that applied to all CSR employees seeking a work-from-home CSR position, not based on any individualized assessment of Poulson's disability-related needs. And, much like the facts in *Holly*, there is a genuine dispute of material facts as to whether some of those criteria were essential. The Court finds no error in the Magistrate Judge's application of *Holly* to the facts of this case.

### c.  *Reasonable Alternative Accommodations*

In its next objection, Defendant contends that it offered reasonable alternative accommodations to Poulson and argues that the Magistrate Judge erred in finding that there were triable issues of fact as to whether those alternatives were reasonable. [Doc. 55 at 19–21]. The Court finds Defendant's arguments to be without merit.

First, Defendant asserts that it accommodated her need to avoid exposure to COVID-19 by implementing a robust and comprehensive safety program, following applicable governmental guidelines, to eliminate the risk of exposure to COVID-19. But Defendant fails to recognize the difference between a general policy that applies to all employees and an appropriate and reasonable accommodation that could overcome the precise limitations resulting from an employee's disability. *See* 29 C.F.R. § 1630.2(o)(3) (discussing the interactive process). After all, the central purpose of the ADA is to require employers to specifically consider the specific

needs of the *disabled* employee. *See Holly*, 492 F.3d at 1262. The R & R correctly states that Defendant's safety efforts applied to all employees generally and were not particularized to address the specific needs arising from Poulson's disabilities—that she be allowed to work from home because of her heightened risk of severe COVID-19 effects, as recommended by her doctor.  Furthermore, the record indicates that there are factual disputes as to whether Defendant actually enforced its safety protocols. [*See* Doc. 46-2 at ¶¶86–94].

Next, Defendant asserts that the accommodation of taking additional leave (4 more weeks of FMLA leave, or up to 12 months of extended non-FMLA leave) was available to Poulson.  In the R & R, the Magistrate Court correctly found that her remaining leave would not have resolved her disability-related issue, given the indefinite nature of the COVID-19 pandemic, and it is arguably unreasonable to suggest that Poulson take unpaid leave for an unknown period of time—particularly where, as here, Defendant had allowed other CSRs to work remotely. And, according to Poulson, Defendant did not even discuss the availability of these alternate accommodations with her. [*See* Doc. 31-3 at ¶¶44, 50, 52, 60].

Based on the foregoing, the Court finds that there are genuine issues of material fact as to whether Defendant offered Poulson reasonable alternative accommodations to Poulson.

### d. *Undue Hardship*

Defendant contends that the Magistrate Judge failed to consider its arguments that assigning Poulson to a work-from-home CSR position would have imposed an undue hardship on Defendant. [Doc. 55 at 21–27].  Upon review of the R &R, however, it appears that the Magistrate Judge did conclude that genuine issues of fact existed as to "whether it would be unreasonably burdensome for Defendant to provide the required [equipment], reassign or switch around one of [Poulson's] assigned clients, and otherwise authorize Poulson to work from home." [Doc. 50 at 39–40].

In its objection, Defendant's arguments relating to "undue hardship" center around four main points: that providing her with the necessary equipment would require Defendant to use equipment that was needed for more critical departments; that Defendant would have to deviate from its normal assignment procedures and give preferential treatment to Poulson; that assigning Poulson to a work-from-home CSR position would reduce Defendant's ability to serve its client's accounts; and that Poulson's internet speed at home would have prevented her from properly serving its client's customers. [*See* Doc. 55 at 23-24].  The Court finds these arguments to be uncompelling.

Here, the Court has already found that there are genuine issues of material fact as to Poulson's internet speed and her ability to perform her job while working

remotely and, thus, Defendant has failed to show that it is undisputed that these aspects of the requested accommodation would cause an undue hardship on Defendant. Further, Defendant has offered no explanation as to why it could not obtain the additional equipment necessary to accommodate Poulson's disability-related request without having to reallocate its existing equipment that was needed for other departments. The imposition of some burden or expense does not necessarily mean that it is unreasonable. In fact, the ADA specifically provides that a reasonable accommodation may include the "acquisition…of equipment or devices" to accommodate a disabled individual's needs. *See* 42 U.S.C. § 12111(9)(b). Lastly, Defendant's argument that the requested accommodation would impose an undue hardship because it would require Defendant to give preferential treatment to Poulson is without merit. Under the ADA, an employer is required to treat an employee with a disability differently (preferentially), and the fact that this difference in treatment may require the employer to deviate from its standard disability-neutral policies or procedures for assignment of remote work positions is of no consequence. *See Holly*, 492 F.3d at 1263.

In sum, the Court finds that there are genuine issues of material fact as to whether Poulson's requested accommodation would impose an undue hardship on Defendant.

### e. *Adverse Employment Action*

In its final objection to the R & R, Defendant contends that the Magistrate Court erred by failing to consider whether Poulson was subjected to an adverse employment action, an essential element of a failure to accommodate claim. [Doc. 55 at 24–26]. Specifically, Defendant argues that it is entitled to summary judgement because there is no evidence to show that the failure to reasonably accommodate Poulson's disabilities negatively impacted the terms, conditions, or privileges of her employment. *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754–55 (11th Cir. 2023).  The Court disagrees.

Even though the Magistrate Judge did not include a discussion on this issue in the R & R, this Court finds that there are sufficient facts in the record to create a jury issue as to whether Poulson suffered an adverse employment action resulting from the alleged failure to accommodate. Specifically, Poulson stated in her Declaration that she made several complaints about her working conditions after her return from FMLA leave and repeatedly made requests to work from home. When her requests were either ignored or unresolved, she felt that Defendant's failure to accommodate negatively impacted the conditions of her employment and, as a result, she resigned. [Doc. 31-3 at ¶¶73–79]. Accordingly, the Court concludes that Defendant is not entitled to summary judgment on this issue.

**B. Plaintiff's Objections to the R & R**

**1.** <u>Constructive Discharge Claim</u>

In its first objection to the R & R, Plaintiff contends that the Magistrate Judge applied the wrong standard in determining that summary judgment should be granted to Defendant on Plaintiff's constructive discharge claim. It also argues that there was sufficient evidence in the record to create a genuine issue of material fact as to whether the conditions at work were so intolerable that Poulson was forced to terminate her employment. [Doc. 54 at 3–10]. Neither of these arguments have merit.

To establish a claim for constructive discharge under the ADA, a plaintiff must prove that her working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999); *see also Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). A plaintiff must show that "the employer intentionally rendered the employee's working conditions so intolerable based on a protected status, such as disability, that the employee was compelled to quit involuntarily." *Richio v. Miami-Dade Cnty.*, 163 F. Supp. 2d 1352, 1367 (S.D. Fla. 2001); *see also Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir.1982). Whether a plaintiff's working conditions were "sufficiently intolerable" is judged by an objective standard, rather than by the employee's feelings. *Richio*, 163 F. Supp. at 1367.

In making his recommendation to this Court, the Magistrate Judge concluded that there are "insufficient facts in the record to support [Defendant's] claim for constructive discharge" and that Plaintiff "does not show that Defendant's actions created intolerable conditions, that Defendant targeted Poulson, or that it intentionally engaged in conduct that gave her no choice but to quit." [Doc. 50 at 42–43]. According to Defendant, the above-quoted language indicates that the Magistrate Judge applied the wrong standard on motion for summary judgment—construing it to mean that Defendant was required to prove its claim instead of just presenting sufficient facts to create a genuine issue for trial. The Court disagrees with Defendant's interpretation of the above-quoted language. Upon review of the R & R, it is clear that the Magistrate Judge acknowledged the proper standard to apply on summary judgment [*see* Doc. 50 at 18–20] and subsequently concluded that the facts, when viewed in the light most favorable to Plaintiff, were insufficient to create a genuine issue of material fact (or "support") for the claim for constructive discharge under that standard. Therefore, the Court overrules this portion of the objection.

In regard to the sufficiency of the evidence, the Court agrees with Magistrate Judge's conclusion that there are insufficient facts in the record to create a triable issue on the claim for constructive discharge. In support of its claim, Plaintiff points to facts that Poulson made repeated requests to work from home based on her health

and safety concerns and Defendant did not immediately grant her requests. Plaintiff contends that Defendant's act of placing her in the que of its normal "work-from-home" assignment procedures and failure to take her concerns seriously rendered her working conditions intolerable. Further, Plaintiff asserts that Defendant engaged in the foregoing pattern of behavior with the intent to force her to quit. [Doc. 54 at 5–10]. However, when viewing all the facts in the light most favorable to Plaintiff, the Court finds that the facts in the record are insufficient to authorize a jury to conclude that the working conditions were so intolerable that a reasonable person in Poulson's position would be compelled to resign from her employment. Furthermore, the Court finds that the facts of this case are insufficient to show that Defendant acted, or failed to act, with the intent to force Poulson to resign.

It goes without saying that Defendant was not responsible for the severe and pervasive effects of the COVID-19 pandemic. Indeed, the Court acknowledges that people all around the world at that time, like Poulson, were concerned about COVID-19 and their abilities to protect themselves from contracting the virus while at work and other public places. And the facts show that Defendant, like most employers during the height of the pandemic in 2020, had to juggle its business demands and constraints with the uncertainties of the pandemic in an unprecedented, fast-paced, and ever-changing environment. In response to this pandemic, Defendant implemented the recommended health and safety protocols, provided training to its

employees on how to avoid exposure to the virus, and even transitioned some of its eligible workforce to remote work when feasible. While Defendant arguably did not sufficiently consider Poulson's alleged disability-related needs in assessing her request to work remotely or discuss what other accommodations might be necessary and appropriate for her, Defendant at least considered Poulson's request for a work-from-home CSR position based on its generally-applicable criteria. Unfortunately, one of the clients assigned to Poulson did not permit remote work on their accounts at that time. But the record shows that Defendant's failure to immediately assign Poulson to a work-from-home CSR position was not permanent in nature, as Plaintiff remained on the list candidates to be assigned to a work-from-home position and Defendant continued to seek additional equipment and obtain approvals from its credit card issuer clients to allow remote work on their accounts. The record also shows that Defendant was still taking steps to accommodate her request to work from home. [Doc. 43 at 95 –96]. Nevertheless, less than a month after she returned to work from FMLA leave, Poulson resigned from her employment.

Although Defendant's inability to immediately grant Poulson's requested accommodation "might cause a reasonable person to become frustrated and agitated," it has been held that even a "lengthy and somewhat sloppy process" is

"not so egregious that it would cause a reasonable person to resign."[3] *Brown v. K&G Men's Ctr.,* No. 1:07-cv-2355, 2009 WL 10665772, *8 (N.D. Ga. Apr. 28, 2009).  In the present case, the Court finds that there is absence of facts in the record to create a genuine issue as to whether Defendant's actions in the height of the COVID-19 pandemic rendered its workplace conditions so objectively intolerable that Poulson was forced to resign, that Defendant targeted Poulson because of her alleged disabilities, or that it intentionally engaged in conduct that gave her no choice but to resign from her employment. Accordingly, the Court agrees with the findings and conclusions of the R & R that Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.

**2.** Retaliation Claim

In its Amended Complaint, Plaintiff alleges that Defendant retaliated against Poulson for taking FMLA leave by excluding Poulson from her requested accommodation. [*See* Doc. 3 at ¶¶72–83]. Upon review of the record, the Court agrees with the Magistrate Judge's conclusion that Plaintiff's retaliation claim is nothing more than an improper attempt to repackage its failure to accommodate claim. *See Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 148–49  (11th

---

[3] The Court notes that the EEOC's own guidance indicates that the circumstances surrounding COVID-19 pandemic may "result in excusable delays during the interactive process" as employers face "new challenges that interfere with responding expeditiously to a request for accommodation."  *See*  https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D at D.17.

Cir. 2021) (holding that the plaintiff's retaliation claim improperly "repackaged" or "recharacterized" her failure to accommodate claim because the claim was really about what the employer "failed to do—not about what it did do—and that means it was a claim of discrimination"). As there is no real distinction between "excluding" Poulson from her requested accommodation and "failing to accommodate" her request, the Court finds that Plaintiff's retaliation claim is not viable as a separate claim.

Furthermore, Plaintiff's retaliation claim is premised on the fact that Wright sent Poulson an email indicating that she would not be eligible for a work-from-home position until she was released from her FMLA leave. [Doc. 54 at 11; Doc. 32-51 at 2; *see also* Doc. 36-2 at ¶¶223–226; Doc. 32 at 95–96; Doc. 40 at 97–98]. But Plaintiff fails to acknowledge that, in that same email, Wright indicated that Poulson (while on FMLA leave) had been placed "on the list" of employees who were being considered for the next round of work-from-home assignments and requested that Poulson perform an internet speed test to see if it met the requirements. These facts in no way suggest that Defendant was retaliating against Poulson for taking FMLA leave. Moreover, Plaintiff has failed to present any facts or evidence from which a reasonable inference could be made that Defendant's delay in considering or approving her request was in retaliation for taking FMLA leave.

For the above reasons, the Court agrees with the findings and conclusions of the R & R that Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

**3.** <u>Issue of Disability</u>

In its last objection to the R & R, Plaintiff challenges the Magistrate Judge's recommendation that Plaintiff's motion for partial summary judgment on the issue of "disability" should be denied. [Doc. 54 at 13–18]. In its motion, Plaintiff argues that the evidence in this case is undisputed that Poulson was "disabled," as defined by the ADA, as a matter of law. [*See* Doc. 31-1]. However, the Court agrees with the Magistrate Judge's conclusion that there is a genuine issue of material as to this issue.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities...." 42 U.S.C. § 12102(1)(A); *see also Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). A person may also have a "disability" under the ADA if the person has a record of such an impairment or is regarded as having such an impairment by an employer. *See Mazzeo*, 746 F.3d at 1268 (citing 42 U.S.C. § 12102(1)).

The ADA defines "major life activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,

communicating, and working." 42 U.S.C. § 12102(2)(A). In addition, the ADA Amendments Act of 2008 ("ADAAA") amended the ADA to further provide, *inter alia*, that "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).[4]

The ADA, as amended, further provides that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). Thus, it is easier for a plaintiff to establish that a particular mental or physical impairment is covered as a disability under the ADA because "an extensive analysis is not required to determine whether an individual's impairment is a disability…." *See United States Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016); *Mazzeo*, 746 F.3d at 1268.

In this case, Plaintiff has presented some evidence to show that Poulson suffered from hypertension/anxiety and, during the relevant time period, she was classified as "pre-diabetic." Although Poulson indicates that these conditions have caused her to experience high blood-pressure, headaches, breathlessness, light-

---

[4] The ADA was amended by the ADAAA in 2008, and the amendments became effective on January 1, 2009. *See Dickey v. Dollar Gen. Corp.*, 351 F. App'x 389, 391 n.3 (11th Cir. 2009).

headedness, brain fog, lack of concentration, decrease in energy, and trouble completing simple tasks [*see* Doc. 31-3 at ¶¶24–25, 28–30, 32, 37–39], she also testified at her deposition that that her "pre-diabetes" condition did not limit her day-to-day activities *in any way* and that neither her "pre-diabetes" nor her hypertension/anxiety affected her ability to do her job. [Doc. 32 at 98–100]. The Court acknowledges that Plaintiff has produced medical records to show that Poulson was diagnosed with the above conditions, but those diagnoses were primarily based on the symptoms that Poulson herself reported to medical professionals. And many of the symptoms that she reported stand in contradiction to her subsequent deposition testimony that she was not limited in her day-to-day activities or unable to do her job. Furthermore, following her resignation, Poulson indicated to her new employer that she did not have any disability or *any history of having a disability*. [Doc. 32 at 153; Doc. 32-67]. Poulson later explained, however, that she lied to her new employer because she believed she would not get the job if she disclosed her disabilities. [Doc. 32 at 154].

In sum, the issue of whether Poulson had a "disability" as defined by the ADA in this case is a matter of weighing the evidence and determining which of Poulson's statements are more worthy of belief. On motion for summary judgment, this Court is not authorized to weigh the evidence or make any credibility determinations. *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Circ. 2019). Construing

the above evidence in the light most favorable to Defendant as the non-movant on summary judgment, the Court finds that there is a genuine issue of material fact as to whether Poulson had a physical or mental impairment that substantially limited her major life activities.

## IV. CONCLUSION

After considering the R & R [Doc. 50], the parties' respective objections to the R & R [Docs. 55, 54], and the parties' respective responses to those objections [Docs. 56, 57], the Court receives the R & R with approval and adopts its findings and legal conclusions as the opinion of this Court. Accordingly, it is hereby **ORDERED** as follows:

- Defendant's Motion for Summary Judgment [Doc. 36] is **GRANTED IN PART** as to Plaintiff's claims for constructive discharge and retaliation and **DENIED IN PART** as to Plaintiff's claim for failure to accomodate; and

- Plaintiff's Motion for Partial Summary Judgment [Doc. 31] is **DENIED**.

**IT IS SO ORDERED,** this 24th day of September, 2024.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE